UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROSEMARY WHITE, ET AL.,

        Plaintiffs,                          Civil Action No. 20-CV-12646

vs.

                                             HON. MARK A. GOLDSMITH
DETROIT, CITY OF, ET AL.,

        Defendants.
_____/

**OPINION & ORDER
(1) GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 38) AS TO THE FEDERAL CLAIMS AGAINST THEM AND (2) DISMISSING WITHOUT PREJUDICE PLAINTIFFS' STATE LAW CLAIMS**

Plaintiffs Rosemary and Mi-Chol White[1] bring this 42 U.S.C. § 1983 action against Defendants the City of Detroit and Detroit Police Officer Shirlene Cherry. 3d Am. Compl. (Dkt. 34).[2] Plaintiffs bring two federal claims—a Fourth Amendment unlawful seizure claim against Cherry and a failure-to-train claim against the City—as well as three state claims—conversion, intentional infliction of emotional distress, and negligent infliction of emotional distress. See id.[3] This matter is presently before the Court on Defendants' motion for summary judgment on all claims against them (Dkt. 38). For the following reasons, the Court grants Defendants' motion

---

[1] Mi-Chol is Rosemary's daughter. Because Rosemary and Mi-Chol share the same last name, the Court refers to each individual by first name.

[2] There is also an unnamed defendant ("Jane Doe") listed on the docket. However, Plaintiffs do not appear to bring any claims against an unnamed defendant in the third amended complaint. Accordingly, the Clerk's Office is directed to terminate Jane Doe as a defendant on the docket.

[3] In their response to the motion for summary judgment, Plaintiffs state that they "have agreed to waive their claim for intentional infliction of emotional distress." Resp. at 27 (Dkt. 51).

as to the federal claims against them and dismisses without prejudice Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3).[4]

## I. BACKGROUND

After Detroit police officers apprehended a fleeing suspect who ran through several yards including Plaintiffs', the officers requested a canine unit to come to Plaintiffs' front yard to search for a weapon that the suspect may have discarded there. Sweppy Dep. at 15-17 (Dkt. 51-1).[5] When Cherry arrived with her canine, Roky, officers asked Mi-Chol to put away her two dogs that were outside—Chino, a pit bull, and Twix, a Yorkie Terrier. Mi-Chol Dep. at 11 (Dkt. 38-2). Mi-Chol grabbed Chino to put him into a kennel, but he escaped from her grasp and ran to the front yard. Id. at 12–13. Mi-Chol went inside to grab a leash for Chino. Id. at 13.

Because Chino was still out in the yard, Cherry decided to take Roky to the rear of a neighboring home to begin the search for the discarded weapon. Use of Force Report at 2 (Dkt. 38-3). To do so, she began walking with Roky next to the iron fence that surrounded Plaintiffs' yard. Video from Plaintiffs' security camera shows that Chino ran alongside Roky on the other side of the fence and, as Roky neared the end of Plaintiffs' fence, Chino suddenly locked down on Roky's snout. Pl. Security Footage. After Roky cried out, Cherry looked down to see Roky trapped in Chino's mouth, being jerked by Chino as if Chino were trying to pull Roky through the iron fence. Cherry Body Camera Footage at 4:39–4:41. Cherry screamed, "dog, let go," and

---

[4] Plaintiffs filed a response (Dkt. 51) as well as a supplemental brief (Dkt. 59), and Defendants filed a reply (Dkt. 62). Because oral argument will not aid the Court's decisional process, the motion will be decided based on the parties' briefing. See E.D. Mich. LR 7.1(f)(2); Fed. R. Civ. P. 78(b).

[5] Officer Paul Sweppy was one of the Detroit police officers present during the subject incident.

attempted without success to pull Roky back by his leash. Id. at 4:41–4:43. Chino did not let go. Cherry unholstered her gun and shot Chino, causing him to release Roky. Id. at 4:43–4:45; Pl. Security Footage at 0:07–0:09; Sweppy Body Camera Footage at 10:34–10:37. Approximately six seconds passed between the moment that Chino attacked Roky and the moment that Cherry shot Chino. Chino died as a result of the gunshot.

## II. ANALYSIS[6]

The Court first addresses Defendants' argument that Cherry is entitled to qualified immunity on the Fourth Amendment claim against her. The Court next considers whether Defendants are entitled to summary judgment on the failure-to-train claim. Finally, the Court explains that because Defendants are entitled to summary judgment on the federal claims, the Court will dismiss the state law claims.

### A. Qualified Immunity

Qualified immunity shields government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Created to protect government officials from interference with their official duties, qualified immunity "is an immunity from suit rather than a mere defense to liability."

---

[6] The Court applies the traditional summary judgment standard as articulated in Scott v. Harris, 550 U.S. 372, 380 (2007). The movant is entitled to summary judgment if that party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). If the movant makes an initial showing that there is an absence of evidence to support the nonmoving party's case, the nonmovant can survive summary judgment only by coming forward with evidence showing there is a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 324–325 (1986). Where—is as the case here—unaltered videos depict the genuinely disputed facts, the Court must view the facts in the light depicted by the videos. Scott, 550 U.S. at 378–381.

Mitchell v. Forsyth, 472 U.S. 511, 526 (1985). It allows police officers "breathing room to make reasonable but mistaken judgments and protects all but the plainly incompetent or those who knowingly violate the law." Stanton v. Sims, 571 U.S. 3, 6 (2013) (punctuation modified). After a defending officer initially raises qualified immunity, the plaintiff bears the burden of showing that the officer is not entitled to qualified immunity. Burgess v. Fischer, 735 F.3d 462, 472 (6th Cir. 2013).

Qualified immunity involves a two-step inquiry. Pearson v. Callahan, 555 U.S. 223, 236 (2009). First, viewing the facts in the light most favorable to the plaintiff, the Court must determine whether the officer committed a constitutional violation. Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002). Second, the Court must determine whether that constitutional right was clearly established at the time of the incident. Id. Here, Defendants concede that "it is clearly established in the 6th Circuit that people have a 4th Amendment constitutional right to not have one's dog unreasonably seized." Mot. at 5.[7] In other words, Defendants challenge only Plaintiffs' ability to prove the first prong. Accordingly, the Court confines its analysis to the first prong.

"Reasonableness is the touchstone of any seizure under the Fourth Amendment." Brown, 844 F.3d at 567. Reasonableness is an objective inquiry assessed from the time that the officer's actions took place. Id. at 568. To determine whether Cherry's seizure of Chino was objectively reasonable, the Court must "balance the nature and quality of the intrusion on the individual's

---

[7] Nor would Defendants be successful in arguing otherwise. Precedent from the United States Court of Appeals for the Sixth Circuit shows that it was clearly established before the subject shooting occurred that the unreasonable killing of a dog is an unconstitutional seizure of personal property under the Fourth Amendment. Brown v. Battle Creek Police Dep't, 844 F.3d 556, 566 (6th Cir. 2016).

4

Fourth Amendment interests against the importance of the governmental interest alleged to justify the intrusion and determine whether the totality of the circumstances justified the particular sort of seizure." Id. (punctuation modified). A seizure becomes unlawful when it is more intrusive than necessary. Florida v. Royer, 460 U.S. 491, 504 (1983). The plaintiff bears the burden of proving that the seizure was unreasonable. West v. Atkins, 487 U.S. 42, 48 (1988).

In Brown, the Sixth Circuit held that the officers' shooting of the plaintiffs' dogs was a severe intrusion "given the emotional attachment" between dogs and their owners. 844 F.3d at 568. Thus, Cherry's shooting of Chino was likewise a severe intrusion. However, for the reasons explained below, despite the severity of the intrusion, Cherry's actions were nevertheless objectively reasonable.

The Sixth Circuit has not directly addressed the issue of reasonableness in the context of an officer's shooting of a pet to protect the officer's canine partner. However, as a starting point for its analysis, this Court uses the Sixth Circuit's holding in a related context—i.e., the reasonableness of an officer's shooting of a pet to protect the officer's own safety. The Sixth Circuit has held that the severity of the intrusion of an officer's shooting of a pet is outweighed when the officer reasonably perceives the pet to pose an imminent danger to the officer's own safety. Id. at 567 (holding that officers were justified in shooting and killing a pit bull that barked aggressively and then lunged at one of the officers). An officer may also use deadly force against an animal who threatens the safety of fellow officers. Robinson v. Pezzat, 818 F.3d 1, 12 (D.C. Cir. 2016) ("Given that [the dog] bit [the second officer] hard enough to puncture her leather boots, [the first officer's] belief—just seconds later—that the dog continued to pose an imminent threat even absent additional aggressive behavior was hardly unreasonable.").

5

These principles logically extend to an officer's use of deadly force against a pet in situations where the pet poses an imminent danger to the officer's canine partner. Canine partners play an important role in law enforcement. They help to detect and prevent the destruction of evidence, find and apprehend suspects, locate and rescue victims, and protect the lives of their human police handlers. Because police officers rely on their canine partners to effectively perform the officers' jobs and protect the officers' safety, an officer's shooting of a pet—although a severe intrusion—simply does not outweigh the important government interest in protecting a police dog's safety, where the pet poses an imminent danger to the police dog.

Outside this circuit, at least one other court has held that an officer reasonably uses deadly force against a pet that poses an imminent danger to the officer's canine partner. In Warboys v. Proulx, 303 F. Supp. 2d 111 (D. Conn. 2004), the defendant-officer, his fellow officers, and the defendant's canine partner were attempting to track a fleeing suspect. Id. at 113. The scent trail of the suspect led the police dog and the officers to the rear of the plaintiff's residence. Id. The plaintiff's son opened a door to the residence, allowing the plaintiff's pit bull to escape. Id. at 113–114. The plaintiff's son made a failed attempt to catch the pit bull, who continued to move towards the defendant-officer and his canine. Id. at 114. The plaintiff's son yelled something to the effect of "he won't hurt you," but the defendant-officer unholstered his gun and fired it into the pit bull's head, killing the pit bull. Id. Approximately five seconds elapsed between the time that the pit bull left the house and the time that the officer shot it. Id.

The Warboys court acknowledged the pit bull "may indeed have approached the officer and his police canine merely to greet and sniff them or to receive a friendly pat on the head." Id. at 118. At the same time, however, the court noted that had the defendant-officer refrained from

6

shooting the pit bull when he did and had the pit bull's behavior turned out to have been hostile, it would have been too late for the officer to use his firearm safely in order to defend himself and his police dog. Id. And had the defendant-officer refrained from shooting and instead had to defend himself from the pit bull by other means in a close-range attack, "the risk of serious injury or death to him and his canine would have been considerable." Id. The court concluded that "[t]he law simply does not require a reasonable officer in [the defendant-officer's] circumstances to have used less force to protect himself, his police dog, and the officers standing nearby" Id. at 119.[8]

The facts justifying Cherry's shooting of Chino are even stronger than the facts in Warboys that justified the defendant-officer's shooting of the pit bull. Whereas in Warboys there was just a possibility that the pit bull running at the officer and his canine would attack them, here, Chino did attack Roky. Plaintiffs' security footage shows the entire incident. Pl. Security Footage at 0:03–0:09. Specifically, it shows that as Cherry was walking with Roky along Plaintiffs' iron fence, Chino suddenly bit down upon Roky's snout, trapping Roky against the fence. Chino, with his jaws clenched around Roky's snout, attempted to forcefully pull the helpless Roky through the iron gate. When Chino grabbed Roky, Roky cried out, causing Cherry to look down and see the attack. She yelled "dog, let go," and attempted, to no avail, to pull Roky's leash to free Roky. Within seconds, Cherry unholstered her gun and shot Chino, which caused Chino to release Roky from his grip.

Video from additional sources confirms the events as depicted by Plaintiffs' security camera. Although Cherry's body camera did not capture footage of the exact moment when Chino bit Roky (as Cherry was facing away from the dogs), it captured the sound of Roky's cry

---

[8] Plaintiffs do not address Warboys and thus do not attempt to distinguish it.

and, because Cherry quickly turned to look at Roky after hearing his cry, her body camera captured footage of all of the ensuing events. Cherry Body Camera Footage at 4:39–4:45. Sweppy's body camera also did not capture footage of the moment when Chino first bit Roky, as Sweppy was facing away from the dogs at that moment. Sweppy Body Camera Footage. But it did capture the sound of Roky's cry and Cherry's yell. Id. at 10:31–10:34. Because Sweppy then turned around, his body camera captured footage of Chino clenched down upon Roky's snout, Cherry's unholstering of her gun, and Cherry's shooting of Chino. Id. at 10:34–10:37.

Plaintiffs challenge the assumption that Cherry believed that Chino presented a danger to Roky's life when she shot Chino, arguing that (i) "the injuries sustained by Roky were very minor: a laceration to the top of the nose, and nothing more" and (ii) "in the use of force report completed by Defendant Cherry following the subject killing, she indicated that Chino was displaying active aggression, not deadly force." Resp. at 18. However, Plaintiffs cannot use the extent of Roky's injures—known only after the shooting—or the report that Cherry filled out after she had time to reflect upon the attack to show that Cherry's shooting of Chino was unreasonable.[9]

The Supreme Court has warned that courts must consider the reasonableness of an officer's actions as of the moment that the action was taken, with the knowledge that the officer had at the time. Graham v. Connor, 490 U.S. 386, 397 (1989). Courts thus must avoid "the 20/20 vision of hindsight" and, instead, must recognize that officers in tense and evolving situations may have to make a split-second decision about the amount of force that is necessary. Id. at 396–397.

---

[9] Further, an officer need not wait for his or her canine partner to be severely injured before using deadly force against a pet. Rather, as discussed above, all that is required is for the officer to reasonably believe that the pet poses an imminent danger to the police dog.

8

Accordingly, the Sixth Circuit has held that courts must "analyze the question of whether a pet constitutes an imminent threat from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Brown, 844 F.3d at 567.

The footage from Plaintiffs' security camera and Cherry's body camera, described above, clearly shows that an officer in Cherry's position during the moment of the attack would have reasonably believed that Chino was going to kill Roky—or at least seriously physically harm him. Thus, Cherry's immediate belief that Chino's ongoing attack put Roky in imminent danger, see Cherry Dep. at 135 (Dkt. 38-4), was objectively reasonable.

Plaintiffs also challenge the reasonableness of Cherry's decision to walk Roky close to Plaintiffs' fence while Chino was still in the yard. Plaintiffs rely on San Jose Charter of the Hells Angels Motorcycle Club v. City of San Jose, 402 F.3d 962 (9th Cir. 2005), where the Ninth Circuit found that officers' killing of dogs was unreasonable, in part, because the officers were put on notice a full week in advance of the raid that there were dogs at the search location. Id. at 976. The officers, therefore, had "meaningful time" to formulate a plan on how to deal with the dogs. Brown, 844 F.3d at 570. However, Plaintiffs concede that Cherry did not have notice of Chino's presence before she arrived at Plaintiffs' residence. Resp. at 12–13. Thus, this case is not like Hells Angels. Rather, it is like Brown, where the Sixth Circuit held that officers who were informed on their way to a raid of at least one dog's presence did not have notice or meaningful time to make arrangements for the protection of the dogs. Brown, 844 F.3d at 570–571. Consequently, the officers' failure to make advance arrangements for the protection of the dogs was reasonable. Id. at 571.

Plaintiffs' real point appears to be that "the . . . confrontation between Roky and Chino

9

could have been avoided had Defendant Cherry simply kept Roky away from the fence line where Chino was located." Resp. at 13. Plaintiffs contend that Cherry should have known to keep Roky away from the fence line because about a minute before Chino attacked Roky, Chino poked his nose through the fence and, therefore, Cherry knew that Chino could fit his nose through the fence. Statement of Additional Material Facts ¶ 4 (Dkt. 51) (citing Sweppy Body Camera Footage at 9:20). Video from Sweppy's body camera confirms that Cherry saw Chino run and stick his nose through the fence about a minute before the attack. But just because Cherry knew that Chino could fit his snout through the fence does not mean that Cherry knew that Chino would act viciously towards Roky. When Chino poked his nose through the fence where Roky was standing, Chino did not display any aggression; he did not lunge at Roky, he did not show his teeth, and he did not bark excessively or aggressively (instead, Chino only let out one, non-threatening bark). Sweppy Body Camera Footage at 9:15–9:22. As a result, Cherry did not have any warning that Chino was an aggressive dog that might attack Roky if the two got too close. It is true that, because even seemingly friendly dogs can act aggressive at times, Cherry's most prudent course of action would have been to keep Roky farther away from the fence. But the fact that Cherry could have acted more cautiously does not render her actions unreasonable. See Brown, 844 F.3d at 572 (noting the difference between "the best possible responses" and "objectively reasonable" actions) (punctuation modified). Because Chino did not display any overtly aggressive behavior before the attack, the Court cannot say that the confrontation between Chino and Roky was the result of Cherry's "plain[] incompeten[ce]." Stanton, 571 U.S. at 6.

It is incredibly unfortunate that Chino was killed—a significant loss for the White family. But under these circumstances, Plaintiffs cannot show that Cherry's split-second decision to shoot

Chino to stop him from physically attacking Roky and to save Roky's life was an unlawful seizure in violation of the Fourth Amendment. Because Plaintiffs cannot show that Cherry committed a constitutional violation, Cherry is entitled to qualified immunity. As a result, Cherry is entitled to summary judgment on the Fourth Amendment claim against her.

### B. Failure to Train

Plaintiffs seek to hold the City liable for failing to properly train and supervise Cherry. In Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), the United States Supreme Court held that municipalities can be subject to § 1983 liability for constitutional violations. A municipality's failure to adequately train or supervise officers may give rise to Monell liability if the failure "amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989).

An important limitation on Monell liability is applicable here. A municipality cannot be subject to § 1983 liability unless one of the municipality's officers or employees committed an underlying unconstitutional act. Baynes v. Cleland, 799 F.3d 600, 622 (6th Cir. 2015); cf. Horton v. City of Santa Maria, 915 F.3d 592, 603 (9th Cir. 2019) (holding that a municipality may be liable even when an individual officer is exonerated on the basis of the defense of qualified immunity, if the exoneration was not based on a finding that no constitutional violation occurred). Thus, when the officer who allegedly committed the underlying act is exonerated on the basis of the defense of qualified immunity, the question for purposes of determining municipal liability is whether the officer was exonerated on the basis that he or she did not commit a constitutional violation. If so, then the municipality cannot be held subject to Monell liability.

Here, the Court has found that Cherry is entitled to qualified immunity because Plaintiffs

11

cannot prove that she committed a Fourth Amendment violation. This finding precludes the City from being found liable on the failure-to-train claim. Accordingly, the City is entitled to summary judgment on this claim.

### C. State Law Claims

Because the Court grants summary judgment to Defendants on the federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over the remaining state law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726–727 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

### III. CONCLUSION

For the foregoing reasons, the Court grants Defendants summary judgment on the federal claims against them and dismisses without prejudice Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(c)(3).

SO ORDERED.

Dated: November 3, 2021　　　　　　　　　　s/Mark A. Goldsmith  
　　　　　Detroit, Michigan　　　　　　　　　　MARK A. GOLDSMITH  
　　　　　　　　　　　　　　　　　　　　　　　United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 3, 2021.

　　　　　　　　　　　　　　　　　　　　　　　s/Karri Sandusky  
　　　　　　　　　　　　　　　　　　　　　　　Case Manager